

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York 10007*

December 3, 2007

BY HAND & ECF

Honorable John G. Koeltl
United States District Court
500 Pearl Street
New York, NY 10007

            Re:  United States v. Charlene Marant,
                 07 Cr. 160 (JGK)

Dear Judge Koeltl:

        The Government respectfully submits this letter to
notify the Court and the defendant of certain additional evidence
that the Government may seek to offer at the trial in this matter
either as direct evidence of the mail fraud scheme charged in the
Indictment or pursuant to Federal Rule of Evidence 404(b) ("Rule
404(b)").

        Briefly, the indictment charges Charlene Marant with
promising to invest Bill and Barbara Druckers' money in stocks
and bonds, but instead spending it on personal and business
expenses.  The first category of evidence involves witnesses who
were directly involved in conversations with Marant concerning
her management of the Drucker's money.  Their testimony thus
includes direct evidence of the charged fraud, even though the
witnesses were themselves also arguably victims of Marant's
scheme.

        The second category of evidence involves witnesses who
can provide evidence tending to prove that Marant invested the
Druckers' monies were never invested in stocks and bonds.  Some
of those witnessses can explain how Marant obtained funds on
certain occasions to repay the Druckers.  Specifically, Marant
persuaded those witnesses to invest with or lend money to her.
They will also testify that they did not know the funds were
going to the Druckers, and Marant never repaid them.  This
testimony is thus direct proof that monies Marant repaid to the

Honorable John G. Koeltl
December 3, 2007
Page 2

Druckers were <u>not</u> the returns on the investments she had promised to make.  Additionally, other witnesses can explain that monies they received from Marant were <u>not</u> for monies invested on the Druckers' behalf.  In one case, Marant forwarded a witness over $90,000 of the Druckers' money.  This witness will testify that he was defrauded of services by Marant prior to her involvement with the Druckers, and that the monies he received was in fact a settlement payment.  This testimony is direct evidence that Marant did not invest the Druckers' monies as promised.

         The third category of evidence involves witnesses who were themselves defrauded under circumstances closely resembling the scheme in which Marant defrauded the Druckers.  This includes promises of safe investments; the establishment of personal relationships that are unusual for a money manager and client; the unauthorized use of funds;  and hostile behavior when the mismanagement of funds was questioned.  This evidence is admissible pursuant to Rule 404(b) as evidence that Marant's misuse of the Druckers funds did not result from mistake.

         At trial, the Government will bear the burden of proving that Marant failed to invest the Druckers' money in stocks and bonds as promised, misdirected their money to other sources and did so purposefully and without their consent.  These three categories of evidence are probative evidence that Marant committed the crime charged.

### I. <u>Relevant Facts</u>

A.   <u>Background of the Fraud</u>

         The evidence at trial will show that Charlene Marant defrauded an elderly Vermont Couple, Bill and Barbara Drucker, of over $500,000.  The Druckers had met Marant through a mutual friend ("Witness-1") who introduced Marant as a friend and financial adviser.  The Druckers hired Marant to provide financial planning and management in the late 1990s.  Over the next six years, Marant establishes a close personal relationship with the Druckers, frequently spending weekends at their house and celebrating birthdays and other events with them.[*]

---

         [*] Witness-1 had also introduced Marant to another mutual friend ("Witness-2") who also invested money through Marant.  Witness-2 had also asked for Marant's help in investing monies, including the establishment of a charitable trust.  In about 2000, Marant recommended that Witness-2 loan the money to a third party.  Thereafter, those monies disappeared, and Marant stopped

Honorable John G. Koeltl
December 3, 2007
Page 3

As their financial adviser, Marant recommended that the Druckers liquidate various investments, including life insurance plans, and invest those monies in stocks and bonds through Marant. Approximately $800,000 of the Druckers' funds were subsequently transferred to Marant - at times at the Druckers' instructions, and at times by Marant directly without authorization from the Druckers.

Rather than invest the monies as promised, bank records will demonstrate that Marant used the Druckers' monies to fund unrelated personal and business expenses. These included payment of rent on her office space and personal apartment, legal expenses, and the payment of approximately $92,000 to a New York City based construction company.

A representative of the construction company ("Witness-3") that received the $92,000 will testify that Marant had contracted to perform construction services. She later tried to avoid responsibility for paying for those services by offering pretextual complaints about the quality of the work. Witness-3 sued Marant, and on the first day of trial Marant inexplicably told the judge that she would pay $90,000 of the $95,000 claimed. Witness-3 subsequently received two payments for a total of $92,000. Witness-3 will also confirm that the $92,000 was payment on the settlement amount of his dispute, and was not an investment made on behalf of the Druckers or anyone else.

B.   Marant Confirms That the Druckers' Money is
     <u>Invested In Bonds to Witness-4 and Witness-5</u>

The evidence will also show that the Marant-Drucker relationship began to unravel in connection with a construction project that the Druckers sought to fund at their Vermont home. In 2003, the Druckers began plans for an expensive renovation of their home, in part to accommodate the medical needs of Barbara Drucker. In connection with this project, the Druckers requested that Marant provide financial advice and also return invested funds to finance the project. At that time, Marant informed the Druckers that she would move the funds necessary for the project into bonds, as a safe investment to hold the money.

---

returning calls and letters from Witness-2 about the whereabouts of his money. The Government does not yet know all the details in connection with these investments. In the event that it appears they are fraudulent, the Government will submit an additional letter requesting permission to introduce the evidence as similar act evidence pursuant to Rule 404(b).

Honorable John G. Koeltl
December 3, 2007
Page 4

At some point, Marant also advised the Druckers to take out a home equity line of credit to fund the construction, and met with the Druckers and a bank representative ("Witness-4") to obtain those funds. During that meeting, Marant and the Druckers described for Witness-4 that the Druckers' monies had been invested in bonds. The Druckers obtained their loan.

In approximately late 2004 or early 2005, the Druckers contracted with a general contractor ("Witness-5") to perform the renovations. Marant took a central role in interacting with Witness-5. On various occasions, Marant told Witness-5 that the Druckers' money was unavailable to pay for his services immediately because early liquidation of their bond holdings would incur penalties. Ultimately, Witness-5 was never fully paid by Marant, forcing the Druckers to find alternative means for paying him.

C.   Marant Steals Money from Witness-6 and
     <u>Witness-7</u>

There were several occasion where Marant did in fact return monies to the Druckers - totaling about $350,000 - in connection with the construction project. In fact, none of those monies came from the liquidation of stock or bond holdings.

Bank records show that a portion came from $130,000 in loans made by an individual in Georgia ("Witness-6"), who signed a loan agreement with Marant in which Marant promised very favorable returns on the loans. Witness-6 will testify that he was never told anything about repaying the Druckers and that Marant never repaid the $130,000 in loans.

Bank records also show that approximately $200,000 came from monies provided by another individual in Georgia ("Witness-7"). Between early 2005 and early 2006, Witness-7 had invested monies, totaling about $500,000, in order to become a partner or shareholder in a rubber processing company. In fact, he never obtained any interest in such a company. Witness-7 will testify that he also had never heard of the Druckers until mid-March 2006, as explained in the next section.

Witness-7 had worked with Marant on a number of other transacations in which his role was to act as escrow agent. Some of these never came to fruition. During the time period of the Indictment, Marant identified a Florida man who had $50 million to invest in real estate projects. Marant flew to Georgia, and provided Witness-7 a bank draft for $50 million. After Witness-7

Honorable John G. Koeltl
December 3, 2007
Page 5

deposited the draft in his escrow account but before the draft
cleared, he received repeated requests from Marant to release the
funds.  Eventually, Witness-7 learned that the bank would not
honor the draft.  In another deal beginning in about 2001,
Witness-7 acted as escrow agent for $10 million that was intended
for use in a movie production.  In this case, he received the $10
million from an overseas party.  Eventually, Marant persuaded the
overseas party to transfer the $10 million to her control so that
she could take advantage of a purportedly favorable investment
opportunity.  Some time after being transferred to Marant, the
funds disappeared in an overseas account.  The overseas party is
currently suing the escrow insurance carrier for Witness-7 in
order to recover the monies.

D.    The Druckers' Sue Marant And Marant Claims
      That Witness-7's Escrow Account Contains
      Their Funds

        In February 2006, the Druckers filed a complaint, 06
Civ. 1086 (AKH), against Marant, in which they requested, among
other things, an accounting of their funds.  In connection with
that suit, Marant told Judge Richard Holwell that the Druckers'
funds were in a Wachovia account.  Unbeknownst to Judge Holwell,
that account did not contain the Druckers funds, but was an
escrow account belonging to Witness-7.  After Judge Holwell froze
the Wachovia account, Witness-7 contacted the court and requested
that the funds be released.  Judge Holwell granted Witness-7's
request.

        With the freeze lifted, Witness-7 called Marant to ask
her why she had give his account.  Marant responded that she had
gotten herself into a situation, and asked Witness-7 to state
that the account did in fact have the Druckers' funds.  Witness-7
refused her request.

E.    Marant Defrauds Other Investors in 1993-95

        Prior to her work with the Druckers, Marant worked as
an investment adviser at Oppenheimer & Co., Inc.  In about 1993,
she met with a New York City woman ("Witness-8") and persuaded
Witness-8 to invest monies.  In the next two years, Marant
repeatedly violated Witness-8's investment instructions, and
invested the monies in ways contrary to Witness-8's wishes or
without Witness-8's knowledge.  By making these investments,
Marant realized extra sales commissions.  In giving her advice,
Marant frequently promised that the investments had guaranteed
results and that there was no risk of loss.  Marant also struck
up a strong personal relationship with Witness-8 as well as

Honorable John G. Koeltl
December 3, 2007
Page 6

another family member ("Witness-9"), who similarly invested money
through Marant.  In the case of Witness-9, Marant exploited her
close personal relationship and made various misrepresentations
in order to persuade Witness-9 to invest in unsuitable and
inappropriate investments.  While the Government is still
investigating, it appears that Marant's employment with
Oppenheimer was terminated as a result of these and other
activities.

## II.  <u>Discussion</u>

        The Government submits that all of the foregoing
evidence is properly admitted at trial.  As discussed below,
virtually all of the evidence is admitted as direct proof of the
conspiracy, and does not constitute other act evidence.  Even the
other act evidence cited above - namely, the testimony by
Witness-8 and Wtiness-9 - is properly admitted pursuant to Rule
404(b) because it is probative of the fact that Marant did not
act with the Druckers' consent and that she did not misspend
their money by accident.

A.  <u>Applicable Law</u>

        Rule 404(b) of the Federal Rules of Evidence provides
that evidence of "other crimes, wrongs, or acts," while not
admissible to prove bad character or propensity, may be
admissible "for other purposes, such as proof of motive,
opportunity, intent, preparation, plan, knowledge, identity, or
absence of mistake or accident . . . ."  Fed. R. Evid. 404(b).

        The Second Circuit has "adopted the inclusionary or
positive approach to . . . Rule" 404(b).  *United States* v. *Levy*,
731 F.2d 997, 1002 (2d Cir. 1984); *see also United States* v.
*DeVillio*, 983 F.2d 1185, 1194 (2d Cir. 1993) (noting "inclusion
approach" in Second Circuit).  Consistent with this approach,
"evidence of other crimes, wrongs, or acts is admissible for any
purpose other than to show a defendant's criminal propensity."
*United States* v. *Brennan*, 798 F.2d 581, 589 (2d Cir. 1986)
(quoting *United States* v. *Harris*, 733 F.2d 994, 1006 (2d Cir.
1984)); *see also United States* v. *Pipola*, 83 F.3d 556, 565 (2d
Cir. 1996) (Second Circuit's "inclusionary interpretation of the
rule allows evidence of other wrongs to be admitted so long as it
is relevant and is not offered to prove criminal propensity").

        The Second Circuit has set forth three requirements for
the admission of evidence of "other crimes" under Rule 404(b).
First, the trial court must determine that the evidence is

Honorable John G. Koeltl
December 3, 2007
Page 7

offered for a purpose other than to prove the defendant's bad
character or criminal propensity. *United States* v. *Mickens*, 926
F.2d 1323, 1328 (2d Cir. 1989). Second, the trial court must
make a determination that the evidence is relevant under Rules
401 and 402 of the Federal Rules of Evidence, and that it is more
probative than unfairly prejudicial under Rule 403. *United
States* v. *Thomas*, 54 F.3d 73, 81 (2d Cir. 1995); *Mickens*, 926
F.2d at 1328. Third, the court must provide an appropriate
limiting instruction to the jury, if one is requested. *Thomas*,
54 F.3d at 81; *Mickens*, 926 F.2d at 1328-29. Applying these
principles, the Second Circuit has routinely approved of the
admission of "other crimes" evidence with respect to the issues
of knowledge and intent. *See, e.g., United States* v. *Garcia*, 291
F.3d 127, 136 (2d Cir. 2002); *Thomas*, 54 F.3d at 81-82; *United
States* v. *Meyerson*, 18 F.3d 153, 166-67 (2d Cir. 1994); *United
States* v. *Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992); *United
States* v. *Oshatz*, 912 F.2d 534, 542-43 (2d Cir. 1990).

        However, outside of Rule 404(b), the Government may
offer proof of other bad acts to the extent that these acts
"provide the jury with the complete story of the crimes charged
by demonstrating the context of certain events relevant to the
charged offense." *United States* v. *Inserra*, 34 F.3d 83, 89 (2d
Cir. 1994). In this connection, "an act that is alleged to have
been done in furtherance of the alleged conspiracy . . . is not
an 'other' act within the meaning of Rule 404(b); rather, it is
part of the very act charged." *United States* v. *Concepcion*, 983
F.2d 369, 392 (2d Cir. 1992). Likewise, if evidence of prior
criminal activity is "inextricably intertwined" with the crimes
charged and thus is necessary to "complete the story," the Court
may admit it without a showing under Rule 404(b). *See, e.g.,
United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (holding
that evidence of prior criminal activity may be admitted, even if
uncharged, where it "arose out of the same transaction or series
of transactions as the charged offense, if it is inextricably
intertwined with the evidence regarding the charged offense, or
if it is necessary to complete the story of the crime on trial")
(citation omitted).

        In others words, such evidence is admissible as direct
evidence of the charged scheme where it helps (1) explain the
development of the illegal relationship between the co-
conspirators; (2) explain the mutual trust that existed between
the co-conspirators; and (3) complete the story of the crime
charged. See United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir.
1993) (evidence of prior acts of car theft and drug dealing
properly admitted to show development of illegal relationship

Honorable John G. Koeltl
December 3, 2007
Page 8

between defendant and co-conspirator and to explain how defendant
came to play important role in conspiracy); <u>United</u> <u>States</u> v.
<u>Pitre</u>, 960 F.2d 1112, 1119 (2d Cir. 1992) (evidence of prior
narcotics transactions admissible as relevant background
information to explain relationship among alleged co-
conspirators); <u>United</u> <u>States</u> v. <u>Roldan-Zapata</u>, 916 F.2d 795, 804
(2d Cir. 1990) (evidence of pre-existing drug trafficking
relationship between defendant and co-conspirator admissible to
aid jury's understanding of how transaction for which defendant
was charged came about and his role in it); <u>United</u> <u>States</u> v.
<u>Inserra</u>, 34 F.3d 83, 89 (2d Cir. 1994) ("evidence of other bad
acts may be admitted to provide the jury with the complete story
of the crimes charged by demonstrating the context of certain
events relevant to the charged offense"); <u>United</u> <u>States</u> v.
<u>Lasanta</u>, 978 F.2d 1300, 1307 (2d Cir. 1992) (affirming decision
to admit evidence of prior drug dealing to explain "how the co-
conspirators came to interact with each other, and [to render]
more plausible their joint participation in the heroin and
cocaine conspiracies charged in the indictment.").

B.   The Vast Majority of the Evidence Is Direct
     <u>Proof of the Charged Fraud Scheme</u>

          Under well-settled principles, the vast majority of the
foregoing evidence is not "other act" evidence at all, and should
be admitted as direct evidence of the offenses charged in the
Indictment.[*]

          The testimony of Witness-3 is direct proof of the fact
that Marant did not, as promised, invest the Druckers money in
stocks and bonds, but instead spent it on unrelated personal and
business expenses.  Witness-3 will testify that he received over
$90,000 from Marant in settlement on a civil dispute.  Bank
records will show that the Druckers were the indirect source of
those funds.

          The testimony of Witness-4 and Witness-5 is direct
evidence that Marant had claimed to invest the Druckers' money in
bonds, and is thus direct proof of the charged scheme.  Witness-
4, the bank representative, participated in a meeting with the
Druckers and Marant in which those purported bond investments
were discussed.  The testimony of Witness-5, whom Marant failed

_____

          [*] The Government contends that the only true "other act"
evidence is the testimony from Witness-8 and Witness-9 about
Marant's unauthorized and inappropriate trading in 1993  through
1995.  This evidence is treated in Section II.C below.

Honorable John G. Koeltl
December 3, 2007
Page 9

to pay for construction done at the Druckers' residence, is also direct proof of Marant's scheme.  Marant told Witness-5 where she had purportedly invested the Druckers' money, and provided false and pre-textual reasons for her refusal to forward their money to Witness-5.

        On several occasions, Marant returned monies to the Druckers, purportedly by liquidating the stock and bonds holdings she had established for them.  The testimony of Witness-6 and Witness-7 will demonstrate that the returned funds were not from the liquidations of any investments.  Instead, Marant obtained those funds by defrauding others, Witness-6 and Witness-7, and paying the Druckers in a Ponzi-like scheme.  Witness-6 was never repaid any of the loan he had made to Marant; Witness-7 never saw any return on his purported investment in a rubber processing company.

        The testimony about the civil suit by the Druckers, and Witness-7's conversation with Marant after she lied about the location of the Druckers' funds, is further direct evidence that Marant never invested the Druckers' funds in stocks and bonds.

        All of this evidence proves central facts related to the crime charged.  To the extent it involves other frauds, the testimony is necessary to given the complete factual picture of the crime charged, including how the relationships developed between various persons involved in this matter.[*]

C.    Marant's Fraud Against Witness-8 and Witness-
      9 Between 1993 and 1995 Is Admissible As
      Other Act Evidence

        To prove the charges in the Indictment, the Government must establish that Marant intentionally defrauded the Druckers by misrepresenting how she was investing their money.  The issues of knowledge and intent are presented by the very nature of the allegations.  Moreover, given the proof about how Marant actually

---

        [*] Moreover, even if the other frauds constituted other act evidence and not direct proof of the conspiracy, they would be admissible pursuant to the case law set forth in section II.C below.  Specifically, the various frauds that Marant has committed demonstrate as the purported investment adviser or facilitator for other individuals is highly probative of the fact that, in the case of the Druckers, she was acting intentionally and did not spend their money on personal items by accident or with good intentions.

Honorable John G. Koeltl
December 3, 2007
Page 10

used the Druckers' funds, it seems that the only possible defense
is that Marant did not intend to misuse their money or that
Marant spent the Druckers' money on her personal and business
expenses with their permission.

        Accordingly, the Government seeks permission to
introduce evidence of the Marant's prior involvement in similar
fraud schemes on the issues of knowledge and intent.  Where, as
here, "it is apparent that the defendant will dispute" that she
had the requisite knowledge or intent, evidence of the
defendant's prior involvement in similar criminal activity may be
admitted during the Government's case-in-chief.  United States v.
Inserra, 34 F.3d 83, 90 (2d Cir. 1994).

        Evidence of "other crimes, wrongs or acts" is
admissible under Rules 404(b) and 403 of the Federal Rules of
Evidence if such evidence is relevant to some issue at trial
other than the defendant's propensity to commit the crime
charged, and if the probative value is not substantially
outweighed by the risk of unfair prejudice.  See, e.g.,
Huddleston v. United States, 485 U.S. 681, 685-86 (1988); United
States v. Jaswal, 47 F.3d 539, 544 (2d Cir. 1995).  The Second
Circuit has repeatedly endorsed the "inclusionary" approach to
the admission of other act evidence, under which "evidence of
prior crimes, wrongs or acts is admissible for any purpose other
than to show a defendant's criminal propensity." United States
v. Lasanta, 978 F.2d 1300, 1307 (1992) (emphasis in original)
(citations omitted).  Proof of state of mind, such an intent and
knowledge, or proof of preparation or plan, also are proper
purposes for admission of other crimes evidence under Rule
404(b).  United States v. Teague, 93 F.3d 81, 84 (2d Cir. 1996)
(citing Huddleston v. United States, 485 U.S. 681, 691 (1988));
see also United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir.
1993); United States v. Caputo, 808 F.2d 963, 968 (2d Cir. 1987).

        The Court has broad latitude in determining whether to
admit evidence pursuant to Rule 404(b), and its ruling will be
reviewed only for abuse of discretion.  See Inserra, 34 F.3d at
89.

        There is more than a substantial similarity between the
facts regarding the scheme to defraud the Druckers and the
schemes to defraud Witness-8 and Witness-9.  In both case, Marant
cultivated unusually close personal relationships with the
victims, meeting with them in intimate settings like their homes.
In both cases, Marant promised to invest monies in safe
investments.  She promised the Druckers, for example, that the
construction funds for their home renovations would be held in

Honorable John G. Koeltl
December 3, 2007
Page 11

bonds.  She promised Witness-8 and Witness-9 that the recommended
funds offered guaranteed returns.  In both cases, Marant entered
into unauthorized transactions with the victims' funds or made
misrepresentations in connection with the use of the funds.  In
the case of the Druckers, she spent their money on, among other
things, her own ongoing business expenses.  In the case of
Witness-8 and Witness-9, she used their money to purchase far
more shares in funds than they had authorized.

D.    The Proffered Evidence Should Not Be Excluded
      Under Rule 403

        The proffered "other acts" evidence is highly relevant
and probative of the crimes charged in the Indictment, and there
is no basis to exclude it under Rule 403.  The defendant will not
be unfairly prejudiced by the admission of the evidence.

        Most importantly, the proffered Rule 404(b) evidence is
not significantly more sensational than the evidence of the
charged crimes that will be presented at trial, but consists of
the same type of evidence that will be presented to prove the
charges in the Indictment.   In these circumstances, there is no
danger that the admission of the above-described evidence of
Marant's other financial dealings will elicit an emotional or
otherwise inappropriate response from the jury.  See United
States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992) (admitting
evidence of prior narcotics transactions in narcotics case where
other acts evidence "'did not involve conduct any more
sensational or disturbing than the crimes with which [the
appellants were] charged'") (quoting Roldan-Zapata, 916 F.2d at
804).

        Evidence is unfairly prejudicial "only when it tends to
have some adverse effect upon a defendant beyond tending to prove
the fact or issue that justified its admission into evidence."
United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980).  A
"[d]efendant must show some undue prejudice, apart from the
prejudice implicit in Rule 404(b) evidence."  United States v.
Vargas, 702 F. Supp. 70, 72-73 (S.D.N.Y. 1988) (emphasis added).
Furthermore, the "fact that evidence may be 'damning' does not
render it inadmissible."  Id. (citing United States v. Cirillo,
468 F.2d 1233, 1240 (2d Cir. 1972)).  Here, beyond providing
essential background evidence and direct proof of the charged
scheme, the evidence of prior bad acts committed by the defendant
is admissible under Rules 404(b) and 403 to prove the defendant's
knowledge, intent, opportunity, identity, and lack of mistake or
accident with respect to the offenses charged.

Honorable John G. Koeltl
December 3, 2007
Page 12

### III.  <u>Conclusion</u>

For all of the foregoing reasons, the Government respectfully submits that the background evidence discussed above relating to Witnesses 1 through 7 should be admissible at trial as direct evidence of the crimes charged and, in the alternative, pursuant to Rule 404(b).  The Government also respectfully submits that the "other acts" evidence discussed above relating to Witness-8 and Witness-9 should be admissible at trial as other act evidence pursuant to Rule 404(b).

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:    /s/ William J. Harrington
WILLIAM J. HARRINGTON
Assistant United States Attorney
(212) 637-2331

cc:  Philip Weinstein, Esq.
    (By ECF)